[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-13467

_____

DEMARCUS ALI SEARS,

Petitioner-Appellant,

*versus*

WARDEN GDCP,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:10-cv-01983-TWT

_____

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Petitioner Demarcus Ali Sears sits on death row in Georgia following his convictions for kidnapping with bodily injury and armed robbery.  He appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus.  The district court and this Court have granted Sears certificates of appealability on nine combined issues.

After a thorough review of the record and with the benefit of oral argument, we reverse the district court's denial of Sears's habeas petition and remand for a new penalty-phase proceeding.

## I.    BACKGROUND

### A.    *Facts of Conviction*

The tragic facts underlying Gloria Wilbur's rape and murder and Sears's conviction for it are set forth in detail in *Sears v. State*, 493 S.E.2d 180, 182–83 (Ga. 1997) ("*Sears II*").[1]  For the reader's convenience, we summarize them below.

On October 7, 1990, Sears and Phillip Williams were stranded in Atlanta after their car broke down.  *Id.* at 182.  Trying to return home to Ohio, Sears and Williams entered a Waffle House in Smyrna, Georgia, and asked several patrons for money.  *Id.*  They told the patrons that their car had broken down and they

---

[1] Before Sears filed his direct appeal, the Supreme Court of Georgia adjudicated several pretrial issues he raised on interim review.  *Sears v. State*, 426 S.E.2d 553 (Ga. 1993) ("*Sears I*").

were trying to get to Cincinnati. *Id.* Sears was carrying a briefcase that contained brass knuckles, a few knives, and a set of old hand-cuffs. *Id.* He tried to sell some of the items in the suitcase to make money. *Id.* Eventually, a customer gave Sears and Williams direc-tions and a few dollars for bus fare. *Id.* The two decided to go to a nearby Kroger instead, where they were approached by a police officer who saw them loitering outside the Kroger. *Id.* The officer briefly spoke with them but left after receiving a call on his radio. *Id.* Shortly afterward, Sears and Williams decided to steal a car to get back to Ohio. *Id.*

The pair targeted Ms. Wilbur after they saw her park her car and enter the Kroger. *Id.* Around 8:00 p.m. that evening, Ms. Wil-bur returned to her car and put her groceries in her trunk. *Id.* Sears approached Ms. Wilbur, hit her with his brass knuckles, and forced her into the car.[2] *Id.* Williams got into the driver's seat and headed north on I-75. *Id.* Sears pulled Ms. Wilbur into the back seat, told her to be quiet, and handcuffed her. *Id.*

Sears and Williams stopped for hamburgers and gas. *Id.* To avoid detection, Sears forced Ms. Wilbur in between the seats and covered her with book bags. *Id.* On their way to Tennessee, Sears raped Ms. Wilbur. *Id.* Around 1:00 a.m., they crossed into Ken-tucky and stopped the car. *Id.* Ms. Wilbur pleaded to remain in

---

[2] Sears disputed this fact at trial. He argued that Williams accosted Ms. Wilbur and stole the car. He also said this in his post-arrest statement to the police.

the car, but Sears took her into the bushes bordering I-75 and stabbed her to death.  *Id.*

Ms. Wilbur's body was found nearly a week later, and her car was found abandoned in a Cincinnati suburb.  *Id.*  In the backseat, the car had bloodstains that matched Ms. Wilbur and pubic hair that matched Sears.  *Id.*  The police suspected Sears and Williams after obtaining identifications from witnesses at the Waffle House and a tip from an informant in Ohio.  *Id.* at 183.  The police brought them in for questioning, and Sears admitted to stealing the car and kidnapping, raping, and killing Ms. Wilbur.  *Id.* Sears's statement was identical to Williams's statement, except that Sears claimed it was Williams who had hit Ms. Wilbur with brass knuckles, while Williams claimed it was Sears.  *Id.*  Both stated that Sears was the only one to rape and stab Ms. Wilbur.  *Id.*

Sears consented to a search of his mother's house, where he lived.  *Id.*  He accompanied the police during their search and showed them the briefcase and brass knuckles.  *Id.*  Williams pled guilty and received two life sentences.  *Id.*  He testified for the State at Sears's trial.  *Id.*

B.        *State Court Trial Proceedings*

On September 22, 1993, a jury sitting in Cobb County Superior Court convicted Sears of armed robbery and kidnapping with bodily injury.

During the trial's penalty phase, Sears's trial counsel "presented evidence describing [Sears's] childhood as stable, loving, and essentially without incident."  *Sears v. Upton*, 561 U.S. 945, 947

(2010) ("*Sears IV*") (per curiam).  Counsel also had witnesses testify that Sears came from a middle-class background and his family would be devastated if he were sentenced to death.  *Id.*  The mitigation theory emphasized "the adverse impact of Sears' execution on his family and loved ones."  *Id.*  But that strategy ultimately backfired.

After a turbulent deliberations period—which included multiple reports of a deadlock and several notes to the court—the jury found four statutory aggravating circumstances and recommended that Sears be sentenced to death.[3]  The trial court imposed a death sentence for the kidnapping-with-bodily-injury conviction and a life sentence for the armed-robbery conviction.[4]

On July 18, 1996, the trial court denied Sears's motion for new trial.

In Sears's direct appeal of his convictions and sentence, the Supreme Court of Georgia affirmed his convictions but remanded

_____

[3] The jury found an aggravating factor for each of the three capital felonies Sears engaged in while he committed the kidnapping: armed robbery, rape, and murder.  The jury found a fourth aggravating factor based on the "outrageously vile" nature of the kidnapping.

[4] Under Georgia law, a jury may "impose a death sentence for the offense of kidnapping with bodily injury on the ground that the offense of kidnapping with bodily injury was committed while the offender was engaged in the commission of the capital felon[y] of murder," so long as the murder was "sufficiently a part of the same criminal transaction" and was found to be an aggravating circumstance of the kidnapping offense.  *Potts v. State*, 410 S.E.2d 89, 93–94 (Ga. 1991).

the case as to his death sentence for an evidentiary hearing to allow him to develop the record on his claim of jury misconduct. *Sears II*, 493 S.E.2d at 187–88. Following remand, the Supreme Court of Georgia affirmed Sears's death sentence. *Sears v. State*, 514 S.E.2d 426 (Ga. 1999) ("*Sears III*"). The Supreme Court of the United States denied Sears's petition for a writ of certiorari and his petition for rehearing. *Sears v. Georgia*, 528 U.S. 934 (1999); *Sears v. Georgia*, 528 U.S. 1040 (1999).

### C.        State Court Postconviction Proceedings

Sears filed a petition for a writ of habeas corpus in the Superior Court of Butts County on January 13, 2000. He raised thirty-eight claims for relief, but as relevant here, he argued that (1) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the trial court's application of the discovery rule set forth in *Sabel v. State*, 282 S.E.2d 61 (Ga. 1981), was unconstitutional; and (3) his trial counsel was constitutionally ineffective for failing to adequately investigate and present mitigation evidence. The court held an evidentiary hearing in January 2006. Sears presented evidence that he suffers from organic brain damage and psychiatric problems.

"Two different psychological experts testified that Sears had substantial deficits in mental cognition and reasoning—*i.e.*, 'problems with planning, sequencing and impulse control'—as a result of several serious injuries he suffered as a child, as well as drug and alcohol abuse." *Sears IV*, 561 U.S. at 949 (quoting Affidavit of Dr. Tony L. Strickland, Doc. No. 18-27, at 147). One of the experts, a neuropsychologist, testified that Sears's "scores on at least two

standardized assessment tests placed him at or below the first per-
centile in several categories of cognitive functioning, 'making him
among the most impaired individuals in the population in terms of
ability to suppress competing impulses and conform behavior only
to relevant stimuli.'" *Id.* (quoting Strickland Affidavit at 148). The
neuropsychologist's testing found that Sears was "plagued by ex-
treme distress, emotional instability and low self-worth." Strick-
land Affidavit at 149. In addition, the expert testified that "clear and
compelling evidence" showed that Sears suffered from "pro-
nounced frontal lobe pathology"—*i.e.*, brain damage. *Sears IV*, 561
U.S. at 950 (quoting Testimony of Dr. Tony L. Strickland, Doc. No.
18-25, at 69).

Sears also submitted evidence painting a different picture of
his childhood than the portrait presented to his sentencing jury.
Contrary to the typical middle-class upbringing described at trial,
Sears presented evidence that his home was violent and volatile.
Sears's father was verbally and physically abusive to his mother,
and his parents fought constantly. Sears's parents often left him
and his brother with a cousin who purportedly sexually abused
them. Not only that, but Sears's mother beat him, while his father
used military-style drills and other unconventional methods of be-
havior correction to discipline him. For example, after Sears and
his brother locked themselves in the family room, "horsing
around" and "laughing real loud," Sears's father lit a fire outside the
room to "smoke them out."

On January 9, 2008, the state habeas court denied Sears's petition. Doc. No. 21-12. The court dismissed Sears's *Brady* claim, *Sabel* claim, and ineffective-assistance claim for different reasons. First, it found that Sears had procedurally defaulted his *Brady* claim; second, it concluded that Sears's *Sabel* claim was precluded as res judicata; and third, the state habeas court determined that trial counsel was constitutionally deficient, but Sears could not establish prejudice under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. On September 28, 2009, the Supreme Court of Georgia denied Sears's certificate of probable cause to appeal the denial of his habeas corpus petition.

Sears sought review in the Supreme Court of the United States. The Supreme Court granted his petition for a writ of certiorari, vacated the state judgment, and remanded for further proceedings. *Sears IV*, 561 U.S. at 946. The Supreme Court noted that trial counsel "failed to conduct an adequate mitigation investigation," and it deemed trial "counsel's initial mitigation investigation" to be "constitutionally inadequate." *Id.* at 951. The Court further characterized as "[u]nsurprising[]" the fact that the state habeas court "concluded that Sears had demonstrated his counsel's penalty phase investigation was constitutionally deficient"; indeed, the Court described trial counsel's mitigation investigation as "facially inadequate." *Id.* at 951–52.

Then, the Court turned to the state habeas court's prejudice analysis. It found the analysis to be deficient because "it did not correctly conceptualize how [the prejudice prong] applies to the

circumstances of this case." *Id.* at 952. Specifically, the Court found that the state court's prejudice analysis contained two errors. First, the state habeas court "curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory." *Id.* at 953. In other words, the state habeas court should have "question[ed] the reasonableness" of trial counsel's mitigation theory. *Id.*

Second, the state habeas court "failed to apply the proper prejudice inquiry." *Id.* at 954. In particular, the state court found that because trial counsel had presented "*some* mitigation evidence," that court was foreclosed from inquiring "into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Id.* at 955 (emphasis in original). But the Supreme Court held that "[a] proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' 'significant' mental and psychological impairments, along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation." *Id.* at 956.

After the remand, the Supreme Court of Georgia vacated its order denying the certificate of probable cause, vacated the Butts County Superior Court's order, and remanded the case for further proceedings consistent with the Supreme Court of the United States's opinion in *Sears IV*.

On August 16, 2011, the Butts County Superior Court again denied Sears's habeas petition, concluding that he could not demonstrate prejudice with respect to trial counsel's performance during the penalty phase of the trial and otherwise adopting the prior order denying relief.

The Supreme Court of Georgia granted Sears's application for a certificate of probable cause and affirmed. *Sears v. Humphrey*, 751 S.E.2d 365, 395 (Ga. 2013) ("*Sears V*"). In *Sears V*, the court concluded that trial counsel's performance was not deficient, and even if it was, there was no reasonable probability that at least one juror would have voted for a sentence other than death. *Id.* at 376, 395. The Supreme Court of the United States denied certiorari review. *Sears v. Chatman*, 572 U.S. 1118 (2014).

Altogether then, six prior decisions that were issued before Sears's federal habeas proceedings began in earnest are relevant to our decision today. For the reader's convenience, we recap them below and provide a brief explanation of their relevance to our decision.

| Decision | Relevance |
|---|---|
| *Sears v. State*, 426 S.E.2d 553 (Ga. 1993) ("*Sears I*") | Sears brought an interim (direct) appeal to the Supreme Court of Georgia before his trial. Among the issues was Sears's desire to hire a psychiatric expert. |
| *Sears v. State*, 493 S.E.2d 180 (Ga. 1997) ("*Sears II*") | This was Sears's direct appeal of his conviction. The Supreme Court of Georgia reviewed his *Sabel* claim, among others. |

| Decision | Relevance |
|---|---|
| *Sears v. State*, 514 S.E.2d 426 (Ga. 1999) ("*Sears III*") | After remanding Sears's case to allow him to develop a record on his juror-misconduct claims, the Supreme Court of Georgia reviewed those claims. |
| *Sears v. Hall*, No. 2000-V-27 (Ga. Super. Ct. Butts Cnty. Jan. 9, 2008), Doc. No. 21-12 | The state habeas court reviewed Sears's ineffective-assistance-of-counsel claims and concluded that Sears's counsel performed deficiently but that the performance did not prejudice Sears. |
| *Sears v. Upton*, 561 U.S. 945 (2010) ("*Sears IV*") | The Supreme Court of the United States granted certiorari, vacated the state habeas court decision, and remanded for reconsideration of the *Strickland* prejudice analysis. |
| *Sears v. Humphrey*, 751 S.E.2d 365 (Ga. 2013) ("*Sears V*") | The Supreme Court of Georgia concluded that Sears's counsel did not perform deficiently and that there was no prejudice. |

### D.    *Federal Habeas Corpus Proceedings*

On June 25, 2010, while his state habeas proceedings were still ongoing, Sears filed his petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Northern District of Georgia.[5]  After Sears exhausted his remedies

---

[5] The district court initially stayed the federal proceedings and held them in abeyance pending Sears's exhaustion of state remedies on remand from the Supreme Court's decision in *Sears IV*.  After the state proceedings ended, the

in state court, he filed his first amended petition—the operative petition in this case.  On May 23, 2018, the district court issued a final order denying relief on all Sears's claims.  Sears timely filed a notice of appeal.

The district court and this Court have allowed Sears to appeal nine claims: (1) whether Sears's trial counsel was unconstitutionally ineffective for failing to investigate and present mitigation evidence during the penalty phase of the trial; (2) whether the *Sabel* discovery rule violated Sears's constitutional rights; (3) whether several jurors committed misconduct, denying Sears a fair trial and reliable sentencing; (4) whether the State unconstitutionally relied on an aggravating factor under O.C.G.A. § 17-10-30(b)(7); (5) whether Sears's trial counsel provided unconstitutionally ineffective assistance by failing to perfect the record on the *Sabel* issue; (6) whether the State violated *Brady*; (7) whether the trial court's actions and instructions during the penalty-phase deadlock were coercive; (8) whether the trial judge's failure to recuse himself denied Sears due process and a fair trial; and (9) whether the cumulative impact of any errors denied Sears a fair trial.

## II.    STANDARDS OF REVIEW

"We review de novo the denial of a petition for a writ of habeas corpus." *Morrow v. Warden, Ga. Diagnostic Prison*, 886 F.3d 1138, 1146 (11th Cir. 2018) (quotation omitted).    But the

---

district court reinitiated Sears's § 2254 petition and allowed him to amend his petition.

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs our review of federal habeas petitions. AEDPA prescribes a highly deferential framework for evaluating issues previously decided in state court. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (en banc). Under AEDPA, a federal court may not grant habeas relief on claims that were "adjudicated on the merits in [s]tate court" unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established law if the court arrived at a conclusion opposite to the one reached by the Supreme Court on a question of law, or the state court confronted facts that are "materially indistinguishable" from Supreme Court precedent but arrived at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state-court decision is an "unreasonable application" of clearly established law if the state court identifies the correct governing legal rule from the Supreme Court's holdings but unreasonably applies it to the facts of a particular defendant's case. *Id*. at 407–08.

As for AEDPA's unreasonable-application-of-federal-law provision, "the key word is 'unreasonable,' which is more than simply incorrect." *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1354 (11th Cir. 2020). To meet this standard, "a prisoner

must show far more than that the state court's decision was merely wrong or even clear error." *Pye*, 50 F.4th at 1034 (quoting *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam)). Instead, "[t]he decision must be 'so obviously wrong that its error lies beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Shinn*, 141 S. Ct. at 523). This is "a difficult to meet and highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt." *Raulerson v. Warden*, 928 F.3d 987, 996 (11th Cir. 2019) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). Still, though, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citation and quotation omitted).

On each claimed basis for relief, we review "the last state-court adjudication on the merits." *See Greene v. Fisher*, 565 U.S. 34, 40 (2011). But when the state court did not reach the merits of the claim, "federal habeas review is not subject to the deferential standard that applies under AEDPA[.]" *Cone v. Bell*, 556 U.S. 449, 472 (2009). "Instead, the claim is reviewed de novo." *Id.* The Supreme Court has instructed that we should presume "the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citation omitted). There is an "indication . . . to the contrary" where, for example, the state court has denied

the petitioner's claim on only one prong of the *Strickland* test, so we would review de novo the prong that the state court never reached. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

We also must defer to a state court's determination of the facts unless the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(d)(2) works much like § 2254(d)(1) in that it requires us to give state courts "substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "We may not characterize . . . state-court factual determinations as unreasonable 'merely because we would have reached a different conclusion in the first instance.'" *Id.* at 313–14 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (alteration adopted). We also presume that the state court's factual determinations are correct, absent clear and convincing evidence to the contrary. *Pye*, 50 F.4th at 1035; 28 U.S.C. § 2254(e)(1).

If a petitioner satisfies § 2254(d)'s requirements, we then consider whether the state court's error was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In collateral cases, a federal constitutional error is harmless unless it imposed "actual prejudice." *Id.* at 637–38 (citation omitted). In other words, we examine "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

In sum, AEDPA sets "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (internal quotation marks and citations omitted). *See also Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA."). Yet "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In other words, "[d]eference does not by definition preclude relief." *Id*.

## III.  DISCUSSION

We must decide whether the alleged errors during the penalty phase of Sears's trial violated his constitutional rights. And under AEDPA, we must do so while giving deference to the state courts that have previously evaluated Sears's case. After careful review of the record and with the benefit of oral argument, we conclude that Claim II of Sears's petition warrants relief. Georgia's inequitable discovery rule, enshrined in *Sabel v. State*, 282 S.E.2d 61 (Ga. 1981), violated Sears's Fourteenth Amendment right to due process. The Supreme Court of Georgia unreasonably concluded otherwise in *Sears II*. And because Sears's constitutional rights were violated, and we have a grave doubt about the effects of the error, he is entitled to a new sentencing proceeding.

Our decision first addresses Sears's *Sabel* claim. We then explain why Sears is not entitled to relief on several of the remaining grounds presented in his petition.

### A.     Sabel *Claim*

Sears first claims that the state court's application of the unconstitutional rule set forth in *Sabel* violated his federal due-process rights. We agree.

In *Wardius v. Oregon*, the Supreme Court addressed the constitutionality of Oregon's notice-of-alibi discovery rule. 412 U.S. 470, 471 (1973). The rule required defendants who intended to rely on an alibi defense to notify the State of the time and place at which they claimed to be and to provide the names and addresses of witnesses they anticipated calling to support their alibi defense. *Id.* at 471–72 & n.3. But under the rule, the State had no corresponding obligation to provide "reciprocal discovery." *Id.* at 472. Thus, the State did not have to provide the defense with notice of the witnesses it expected to use to rebut the alibi defense. *Id.* at 472 & n.3. The Court held that "the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." *Id.* at 472. The Court made clear that "discovery must be a two-way street" and explained that the "State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses." *Id.* at 475. Such a regime of non-reciprocal discovery, the Court held, was

"fundamentally unfair" and violated the Due Process Clause. *Id.* at 476.

Despite this guidance, in 1981, the Supreme Court of Georgia enshrined an inequitable discovery rule in *Sabel*. There, the criminal defendant sought to retain an expert to examine the evidence that was critical to the case. *Sabel*, 282 S.E.2d at 68. The court agreed that the defendant had a right to hire the expert, but it also required the expert's written results to be furnished to the State, even if the defendant did not ultimately call the witness. *Id.* at 68–69. As the court explained this ruling, "requiring the report of the defendant's expert to be reduced to writing and made available to the state will further the search for the truth." *Id.* So *Sabel* ensured that even if "the defendant d[id] not call the expert as a witness," the State was still entitled to the expert's reports. *Id.* And *Sabel* allowed the State to "call the defendant's expert without adding his or her name to the list of witnesses, or [to] argue to the jury that the defendant would have called the expert had the result of the testing been favorable to the defendant." *Id.* at 69.

Because of this broad authority, the State had wide latitude to use a defense expert's potentially unfavorable conclusions against the defendant, either through tangible evidence such as a written report or through an adverse inference to the jury. And the defendant would have no way of knowing in advance how the retained expert would come out. So by retaining an expert, the defendant risked dooming his own case.

But the government faced no similar Hobson's choice in deciding whether to retain an expert.  Under Georgia law, a defendant could obtain only "those written scientific reports which the state will introduce against the defendant at trial."  *Rower v. State*, 443 S.E.2d 839, 842 (Ga. 1994) (citing O.C.G.A. § 17-7-211).  But he could not "discover scientific reports which the state ha[d] in its possession, but [did] not intend to use."  *Id.*  So after *Sabel*, the discovery rule did not apply equally:  the State could obtain a defense expert's report—whether or not the defendant intended to call the witness at trial or to otherwise use the report—but the defendant could not obtain a state expert's report unless the State planned to use the report at trial.

At the time of Sears's trial, *Sabel* was the law of the land in Georgia.  But after Sears's trial and before Sears's motion for a new trial, the Supreme Court of Georgia decided *Rower* and expressly overruled *Sabel*. *Rower*, 443 S.E.2d at 842.  In *Rower*, the Supreme Court of Georgia held that, in accordance with due-process rights, "with regard to scientific reports, the state is entitled to only those discovery rights specifically granted to the defendant by O.C.G.A. § 17-7-211."  *Id.*  In effect, *Rower* put the State and the defendant on the same footing with respect to expert reports because, under § 17-7-211, "a defendant may discover only those written scientific reports which the state will introduce against the defendant at trial, and may not discover scientific reports which the state has in its possession, but does not intend to use."  *Id.* at 841–42.

We have acknowledged that *Sabel*'s inequitable discovery rule denied defendants due process under *Wardius*. *See Wellons v. Hall*, 554 F.3d 923, 939 (11th Cir. 2009) ("*Wellons I*") ("*Wardius* and *Rower* make clear that the trial court's *Sabel* ruling in [the defendant's] case violated the Due Process Clause of the Fourteenth Amendment because it granted the prosecution greater discovery rights than [the defendant] possessed in preparing for trial."), *vacated on other grounds*, 558 U.S. 220 (2010). As we explain later, we find *Wellons I* persuasive.

### 1.    Factual and Procedural Background

Because *Sabel* controlled when Sears went to trial, it played a central role in trial counsel's strategy. Trial counsel knew early on that they might need a psychological evaluation of Sears to help explain or mitigate the crimes to which he had admitted.[6] Counsel explained that they noticed almost immediately that Sears had a "bizarre affect" and "erratic behavior." Sears lacked "control or reflection concerning the appropriateness of his speech," and had no "appreciation of the seriousness of his circumstances." Along with counsel's own observations, in June 1991, two of Sears's family friends, one a psychiatric nurse, the other a school guidance

---

[6] Trial counsel provided the state habeas court with a joint affidavit that described their decision-making in connection with the mental-health inquiry and *Sabel*. Although we describe the contents of that affidavit to help clarify the background of the claim, because it was not before the Supreme Court of Georgia when it adjudicated Sears's *Sabel* claim on the merits in *Sears II*, we do not initially consider its contents in our analysis. *See infra* Section III.A.2.b; *Pinholster*, 563 U.S. at 181.

counselor, told counsel that Sears needed some psychiatric help and had been placed in the Severe Behavior Handicap program in school. And Sears's mother said that Sears had behavioral problems at school.

Trial counsel believed a psychiatrist was needed, so they moved for funding to hire one. Doc. No. 14-10 at 208–09 ("Motion 11"). But trial counsel were wary that, under *Sabel*, they would have to provide the State with their court-funded expert's conclusions, and they knew that Cobb County prosecutors frequently and successfully invoked that rule. So trial counsel faced the "Hobson's choice" of foregoing any potential mental-impairment evidence or risking the creation of evidence for the State. *Wellons I*, 554 F.3d at 931.

In December 1991, the trial court conducted a multi-day hearing on Motion 11 and other pretrial motions. In support of Motion 11, Sears's counsel specifically argued that compelled disclosure of a defense expert's opinions, "if the defendant does not choose to use an expert at trial," violated the Due Process Clause. Doc. No. 14-16 at 24–25. The State's response was simple: "All of that flies right in the face of . . . *Sable* [sic]." *Id*. at 25.

Trial counsel filed two other motions to try to neutralize *Sabel*. First, in Motion 14, they moved the trial court to prohibit the State from calling defense expert witnesses to testify against Sears. Doc. No. 14-10 at 215–16. Counsel argued that a ruling to the contrary would force Sears to "gamble" seeking expert assistance at the "risk of creating additional evidence for the State." *Id*. Second, in

Motion 44, to limit the State's ability to use damaging statements or unfavorable findings against Sears, counsel moved the trial court for the ability to seek a post-verdict, pre-sentencing psychiatric examination. Doc. No. 14-11 at 289–90.

In response to the pretrial motions, the State invoked *Sabel*, and it argued that Sears had not established a need to warrant the requested experts. It also argued that if Motion 11 were granted, the State should be able to conduct its own psychiatric evaluation.

Before the court ruled on the motions, Sears's trial counsel continued to probe into the potential consequences of undergoing an evaluation. Doc. No. 14-18 at 254–55. Trial counsel also argued that *Sabel* was wrongly decided and that it violated Sears's due-process rights. Doc. No. 14-16 at 34–35. But with no indication from the court that it would deprive the State of its one-sided discovery rights under *Sabel*, counsel determined that they could not move forward with a psychiatric expert. After all, even if the trial court had granted Motion 11 and provided funding to hire an expert, *Sabel* mandated that the State could access the expert's conclusions and use them against Sears, even if Sears himself decided not to rely on the expert. Or the State could use Sears's decision not to call the expert to create an adverse inference that the expert's testimony would be unfavorable. So defense counsel withdrew Motion 11. And before the state habeas court, counsel swore that they did so only to avoid dangers created by the inequitable discovery rule. Following the withdrawal of Motion 11, the trial court denied Motions 14 and 44.

Despite the withdrawal of Motion 11, *Sabel*'s effects still permeated Sears's trial and adversely impacted his defense. For example, due to the denial of Motions 14 and 44, the State could have called any of Sears's experts—regardless of whether Sears used them as witnesses—and Sears did not have the right to a post-verdict, pre-sentencing psychiatric examination. Because of these effects, at the hearing on Motions 14 and 44, Sears's counsel had expressly argued that *Sabel* was "wrongfully decided." But *Sabel* remained controlling law in Georgia, so Sears could not avoid its impact. Thus, Sears's counsel ultimately did not retain a psychiatric expert to assist with the sentencing phase of his trial.

The next month, in January 1992, trial counsel requested funds for an odontologist and microanalyst (microbiologist). At multiple pretrial hearings, counsel once again asserted his objection to the application of the inequitable discovery rule, arguing that it would violate "due process" to allow "one side of the case" to "rid[e] the coat tails of the other side of the case [by] having the defense develop evidence to be used by the prosecution[.]" Doc. No. 14-22 at 4–5; Doc. No. 14-21 at 33. Sears's counsel highlighted the unfairness of the rule, particularly given that the State sought the death penalty. Counsel specifically objected to the requirement that they be forced to disclose the identity of witnesses who would not be testifying. Again, the State invoked *Sabel* in response. The

court approved funding for the defense's experts but compelled disclosure of the experts' identities.[7]

Before trial, counsel filed an interim appeal to the Supreme Court of Georgia on Sears's claim that he was entitled to a presentencing psychiatric examination. *Sears I*, 426 S.E.2d at 556–57. Counsel reiterated the bind Sears faced: a pretrial examination was necessary to evaluate the issues "relevant to the jury in its determination of mitigating circumstances," but it also carried the risk of disclosing incriminating statements to the State. Br. of Appellant at 11–12, Doc. No. 14-28. To preserve Sears's "right to due process of law," counsel sought either a pretrial psychiatric examination, "without waiving the confidence of those communications," or a presentencing examination. The court denied Sears's request and affirmed the trial court's decision. *Sears I*, 426 S.E.2d at 556–57.[8]

After Sears was found guilty and sentenced to death, he moved for a new trial. While his motion was pending, the Supreme Court of Georgia decided *Rower*, which overruled *Sabel*. 443 S.E.2d at 842. Considering that development, Sears's postconviction counsel moved the trial court for funds to retain a mental-

---

[7] Sears ultimately did not consult a microanalyst, and the odontologist's testimony became unnecessary because Sears stipulated at trial to the victim's identity. *Sears II*, 493 S.E.2d at 183.

[8] While *Sears I* addressed (and rejected) Sears's claim for a presentencing examination, the Supreme Court of Georgia did not address Sears's claim for a pretrial examination without the risk of creating evidence for the State. *See Sears I*, 426 S.E.2d at 556–57.

health expert, arguing an expert was needed to show the prejudice
occasioned by *Sabel*. Doc. No. 16-13 at 3–6. That motion included
two relevant proffers: one showing that Sears suffered from a men-
tal disorder and the other that original trial counsel decided to
forgo the pretrial psychiatric evaluation because they were bound
by *Sabel* and feared "creating a witness against their client." It also
offered representations about Sears's psychiatric deficiencies.

The trial court denied the motion without explanation.

Sears's direct appeal contained the same representations
about his psychiatric deficiencies, including Sears's childhood mal-
treatment, his placement in the Severe Behavioral Handicap pro-
gram in school, and trial counsel's averment that Sears was "a man
with obvious psychiatric problems," and it asserted that a "mental
health expert was critical." Br. of Appellant at 54–59, Doc. Nos. 16-
22, 16-23. Postconviction counsel argued that *Sabel* "had the un-
constitutional effect of deterring Mr. Sears' counsel from pursuing
. . . important avenues of expert assistance, namely psychiatric as-
sistance," and therefore "unconstitutionally chilled" his attorneys'
performance and violated Sears's constitutional rights to "effective
assistance of counsel, due process and equal protection." Sears's
attorney explained that the trial court's orders "forced counsel to
forego essential mental health evaluation and investigation" de-
spite the apparent need for both.

The Supreme Court of Georgia acknowledged that, after
*Rower*, a defendant is "not required to have the opinions of his ex-
perts reduced to writing nor is he required to produce any report

that he will not offer at trial." *Sears II*, 493 S.E.2d at 183. But the court disagreed that Sears could show any prejudice from the then-existing *Sabel* rule: "At no time did the trial court order the defendant's experts to produce written reports and give them to the state. Given that Sears withdrew his request for a psychiatrist before any court ruling . . . he has failed to show any chilling effect or other harm from the ruling[.]" *Id.*

Sears raised his *Sabel* claim again in his state habeas petition, but the state habeas court did not consider the portions of Sears's *Sabel* claim relevant here because they were decided on direct appeal and therefore barred as res judicata.

### 2.    Analysis

Sears argues that the *Sabel* rule violated his constitutional rights because it denied him the right to the assistance of a competent expert necessary to assist in his defense. Sears claims that *Sabel* clearly violated *Wardius* and *Ake v. Oklahoma*, 470 U.S. 68 (1985).[9]

### a.    The Supreme Court of Georgia adjudicated Sears's Sabel *claim on the merits.*

Because this is a federal habeas case, we must first determine whether AEDPA's deferential standard of review applies to Sears's *Sabel* claim. AEDPA's standard of review applies to claims that were "adjudicated on the merits" by a state court. 28 U.S.C.

---

[9] Sears also claims the rule violated the Equal Protection Clause under *Griffin v. Illinois*, 351 U.S. 12, 18 (1956), and the Eighth Amendment under *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

§ 2254(d).  If the claim was adjudicated on the merits, we can grant relief only if Sears can satisfy § 2254(d).

Sears argues that no state court adjudicated his *Sabel* claim on the merits.  Even though the Supreme Court of Georgia ruled on his *Sabel* claim in *Sears II*, Sears suggests that the new evidence developed during the state habeas proceedings transformed his *Sabel* claim into a new claim because the current version of his claim relies on additional facts that were not before the court in *Sears II*. Thus, Sears urges us to review the *Sabel* claim de novo.  *See Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1151 (11th Cir. 2017) ("If . . . no state court has adjudicated the merits of a claim that was properly presented, 'federal habeas review is not subject to the deferential standard that applies under AEDPA.  Instead, the claim is reviewed de novo.'" (quoting *Cone*, 556 U.S. at 472) (alteration adopted)).

Our precedent forecloses Sears's position.  We have held that a habeas petitioner "cannot convert his previously asserted 'claim' into a wholly new 'claim' merely by coming forward with new supporting evidence or even new legal arguments."  *In re Hill*, 715 F.3d 284, 292 (11th Cir. 2013); *see also In re Everett*, 797 F.3d 1282, 1288 (11th Cir. 2015) ("New supporting evidence and new legal arguments in support of a prior claim are insufficient to create a new claim.").[10]  Thus, we do not find that Sears's claim to the state

---

[10] Although these cases analyzed whether new evidence can make a new claim "for purposes of § 2244(b)(1)," *In re Dailey*, 949 F.3d 553, 558 (11th Cir.

habeas court was different from the claim he presented to the court on direct appeal.

Because we conclude that Sears's federal *Sabel*-based habeas claim satisfies § 2254(d)'s requirements, we assume that the Supreme Court of Georgia adjudicated Sears's *Sabel* claim on the merits in *Sears II*.[11]  Since the state habeas court rejected Sears's claim

---

2020), we see no reason to distinguish between the definition of a "claim" for purposes of § 2244(b)(1) and § 2254(d).  That said, we recognize the Supreme Court left open the possibility that sometimes, new facts supporting a previously raised claim "may well present a new claim." *Pinholster*, 563 U.S. at 186 n.10.  Indeed, many of our sister circuits have acknowledged that new evidence could "fundamentally alter" a claim and thus created a new claim. *Dickens v. Ryan*, 740 F.3d 1302, 1318–19 (9th Cir. 2014); *Fairchild v. Workman*, 579 F.3d 1134, 1149 (10th Cir. 2009); *Smith v. Quarterman*, 515 F.3d 392, 400–01 (5th Cir. 2008); *Richey v. Bradshaw*, 498 F.3d 344, 352 (6th Cir. 2007); *Landano v. Rafferty*, 897 F.2d 661, 670 (3d Cir. 1990).  This idea aligns with our acknowledgment of a line between "a clarified rendition of an exhausted claim," and a "new claim altogether."  *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1348 (11th Cir. 2004).  But here, because we read Sears's *Sabel* claim before the Supreme Court of Georgia as having the same "basic thrust or gravamen" as his claim before the state habeas court, *Everett*, 797 F.3d at 1288, we cannot conclude that the latter claim was new.

[11] We have doubts whether *Sears II* did, in fact, adjudicate Sears's claim on the merits given that part of Sears's *Sabel* claim in *Sears II* depended on evidentiary proffers regarding Sears's mental-health problems that were unaddressed by the Supreme Court of Georgia. *See Johnson v. Williams*, 568 U.S. 289, 302 (2013) ("A judgment is normally said to have been rendered 'on the merits' only if it was 'delivered after the court heard and evaluated the evidence and the parties' substantive arguments.'" (quoting Black's Law Dictionary 1199 (9th ed. 2009)) (alteration adopted) (emphasis omitted)).  Sears sought to expand the record in his motion for new trial by seeking funds to conduct a posttrial, post-

on res judicata grounds, we look through that decision to the last state-court adjudication on the merits. *Cone*, 556 U.S. at 466–67. That decision was the Supreme Court of Georgia's decision on direct appeal. *See Sears II*, 493 S.E.2d at 183. Our initial review of *Sears II* under § 2254(d) is limited to the record that was before the court in *Sears II*. *Shoop v. Twyford*, 142 S. Ct. 2037, 2043–44 (2022); *Pinholster*, 563 U.S. at 181–82.

> *b.*    Sears II*'s analysis of Sears's* Sabel *claim was unreasonable.*

Because we've assumed that *Sears II*'s analysis of Sears's *Sabel* claim was an adjudication on the merits, we may grant relief only if the state court's decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

Both § 2254(d) provisions are satisfied here. *Sears II*'s cursory analysis ignored the substantial evidence that trial counsel

---

*Rower* evaluation, but the trial court denied his motion. *See Winston v. Kelly*, 592 F.3d 535, 555–56 (4th Cir. 2010) ("If [a] record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)."); *Wilson v. Workman*, 577 F.3d 1284, 1291 (10th Cir. 2009) (en banc) ("When the state court has not considered the material evidence that a defendant submitted to support the substance of his arguments, it has not adjudicated that claim on the merits.").

sought psychiatric evaluations of Sears and withdrew their requests because of *Sabel*. And *Sears II* failed to mention—let alone consider—the Supreme Court's decision in *Wardius*, which explained the constitutional violation the *Sabel* rule perpetuated.

### i. The decision in Sears II *was based on an unreasonable determination of the facts.*

When analyzing *Sabel*'s effects in *Sears II*, the Supreme Court of Georgia concluded that Sears "failed to show any chilling effect or other harm" from the *Sabel* rule and the trial court's corresponding orders on Motions 14 and 44. *Sears II*, 493 S.E.2d at 183. Despite *Rower* and its reversal of the *Sabel* rule, the court in *Sears II* determined that, because of *Sabel*'s purported lack of harm in this case, Sears was not entitled to relief. *Id.* Under our case law, that inquiry is a mixed question of fact and law. *Hall v. Wainwright*, 805 F.2d 945, 947 (11th Cir. 1986) ("The determination of whether a constitutional error is harmless presents a mixed question of fact and law."). And when reviewing mixed questions, we have relied on § 2254(d)(2) to analyze the state court's factual determinations that were necessary to deciding the question. *See Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1297–98 (11th Cir. 2007); *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1252 (11th Cir. 2011). The state court's factual findings are entitled to a "statutory presumption of correctness," but that presumption does "not [apply] to [the court's] mixed determinations of law and fact." *DeBruce v. Comm'r,*

*Ala. Dep't of Corr.*, 758 F.3d 1263, 1266 (11th Cir. 2014) (quoting *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001)).[12]

The Supreme Court of Georgia's conclusion that Sears "failed to show any chilling effect or other harm from" *Sabel* is belied by the record. *Sears II*, 493 S.E.2d at 183. Sears's pretrial motions, posttrial motions, and two appellate briefs teemed with challenges to and attempts to get around *Sabel*'s unconstitutional discovery rule. At each opportunity, Sears's counsel explained their position that the *Sabel* rule impeded their ability to provide Sears with a rigorous defense. In response, the State stood by *Sabel* and argued that the decision squarely foreclosed Sears's arguments.

Sears attempted to mitigate *Sabel*'s impact by moving to prevent the State from calling defense experts at trial, to allow for a

---

[12] The State suggests that *Sears II*'s "holding that there was no 'chilling effect or other harm' is a legal conclusion" rather than a factual finding. The State bases its argument on our decision in *Holsey v. Warden, Georgia Diagnostic Prison*, in which we determined a state court's conclusion that evidence was "largely cumulative" was likely an application of law to facts. 694 F.3d 1230, 1259 (11th Cir. 2012). That is not like what happened here. Here, *Sears II* determined there was no "chilling effect or other harm" from the *Sabel* rule. 493 S.E.2d at 183. This assessment of trial counsel's decisions depended on the state court's "determination of the historical facts of the case." *Holsey*, 694 F.3d at 1259 (collecting cases involving determinations of historical facts). Indeed, whether counsel decided not to proceed with an evaluation of Sears's mental capabilities because of their concern that they would have to turn over any results, regardless of what they might turn out to be, requires the court to assess a historical fact. And even if we assumed this were a purely legal conclusion (which it is not), that conclusion would be an unreasonable application of the Supreme Court's decision in *Wardius*, anyway.

presentencing evaluation, and once *Sabel* was overturned, for a posttrial evaluation. Georgia's state courts, at the trial and appellate levels, blocked Sears at every turn.

Despite this demonstrable record of challenges to the *Sabel* rule, the Supreme Court of Georgia determined that Sears "failed to show any chilling effect or other harm from the ruling that he must give the name of his experts to the state." *Sears II*, 493 S.E.2d at 183. It based its determination largely on the fact that Sears withdrew Motion 11—his motion for funds to hire a psychiatrist—before the court could order Sears to disclose information about his experts to the State even if those experts would not testify. *Id.*

But counsel's decision is precisely what shows the harmful effects of *Sabel* on the defense here. Put simply, the record reflects that counsel withdrew Motion 11 because upon prevailing, they would have been forced to disclose information about the prospective expert without knowing anything about the expert's conclusions, and before deciding whether to rely on the expert at trial. So because of the *Sabel* rule, even if the trial court had granted Motion 11 and provided Sears with funding to hire a psychiatric expert, Sears's counsel could not retain such an expert without taking a significant risk. And the trial court, which was then bound to apply *Sabel*, had no real discretion to blunt *Sabel*'s impact before *Rower*.

Yet without any explanation, *Sears II* ignored Sears's consistent and persistent challenges to the *Sabel* discovery rule. By our count, during the pretrial and posttrial proceedings, Sears's counsel made a variant of the argument against application of *Sabel*'s rule

at least five separate times before the Supreme Court of Georgia decided *Sears II*:  (1) during the pretrial motions hearing that included Motions 11 and 14; (2) during the pretrial hearings to retain a microanalyst and odontologist; (3) on interim appeal to the Supreme Court of Georgia, which resulted in *Sears I*; (4) to the trial court to request a new trial after *Rower* overruled *Sabel*; and (5) to the appellate courts on direct appeal.

So *Sabel*'s "chilling effect" on trial counsel's decision-making was abundantly clear.  *Sears II*'s finding to the contrary is not supported by the record and indeed contradicts it.  *Sears II* based its decision on counsel's decision to withdraw the request for funds before the trial court could issue a ruling.  493 S.E.2d at 183.  But it was clear at the time from counsel's repeated arguments about the *Sabel* rule that the decision to withdraw Motion 11 was spurred by concern about the application of *Sabel* and its requirement that counsel would have to turn over any reports from a psychiatric expert, regardless of their contents.

And Sears's *Sabel* challenges were not made in the abstract; they were presented in support of Motions 11 and 14.  So *Sears II* did more than just ignore Sears's *Sabel* challenges—it cherry-picked facts from the record that distorted the picture of the underlying proceedings.  Specifically, *Sears II* said simply that Sears withdrew his motion "without presenting any argument at the ex parte hearing[.]"  *Id.*

But Sears *did* argue against *Sabel* at the prior hearing where the State was present and participating.  There, Sears's attorney

made it plain that he was concerned *Sabel*'s discovery rule would unconstitutionally burden his client's constitutional rights, including the right to seek expert psychiatric assistance. Counsel's withdrawal of Motion 11 is directly attributable to the trial court's inability to issue a ruling assuring Sears would not be subjected to the *Sabel* rule.

Our assessment of the factual record does not only reflect our own independent review—it also matches the State's representation of the record when the State opposed Sears's petition for a writ of certiorari to the Supreme Court of the United States. Here is what the State said:

> [T]he record shows that [Sears's] counsel, in their ardent representation of him, tried to get around the legal restrictions of *Sabel*. The defense filed a motion to preclude the State from interviewing and calling as witnesses defense experts that the defense had determined not to use. Further, trial counsel filed a motion to have [Sears] evaluated after the guilt-innocence phase but prior to the penalty phase so as to prevent [Sears's] own damaging statements being used against him. The trial court complied with *Sabel* and denied the motion to bar the State from calling a non-testifying defense expert, which confirmed to [Sears's counsel] that there would be a risk that [Sears's] statements to the expert could be used against him in trial

> *and for that reason*, defense counsel chose to withdraw
> their motion for funds for a psychological expert.

Respondent's Brief in Opposition at 15, *Sears IV*, 561 U.S. 945 (2010) (No. 09-8854) (emphasis added), Doc. No. 21-21.

Indeed, even the Supreme Court of Georgia has since recognized that Sears's counsel repeatedly made his *Sabel* challenges. When the court assessed the effectiveness of Sears's trial counsel in *Sears V*, it acknowledged that, at two different pretrial hearings, "trial counsel strenuously argued to the trial court the alleged inequities of the *Sabel* rule and asserted that *Sabel* was wrongly decided." *Sears V*, 751 S.E.2d at 375.

But *Sears II* did not mention any of those proceedings. It referenced only the ex parte proceeding, which was designed to allow Sears to make the requisite showing that he needed a psychiatric evaluation, without being "placed in a position of revealing his theory of the case." *Brooks v. State*, 385 S.E.2d 81, 84 (Ga. 1989). But at that ex parte hearing, Sears's counsel had no reason to rehash their arguments against the *Sabel* rule, which they had already made at the prior hearings where the State was present. Yet *Sears II* relied on trial counsel's purported failure to raise the *Sabel* argument at this ex parte hearing, without acknowledging that the argument was, in fact, made at the proper times.

Because the record clearly contradicts *Sears II*'s determination about *Sabel*'s chilling effect, Sears has satisfied his burden to show that the state court erred. *See* 28 U.S.C. § 2254(e)(1); *Pye*, 50 F.4th at 1035 (noting habeas petitioner's burden to "show[] by clear

and convincing evidence that a particular state-court factual deter-
mination was wrong"). And we further conclude that *Sears II*'s fail-
ure to consider the full record resulted in an unreasonable determi-
nation of the facts. 28 U.S.C. § 2254(d)(2). Indeed, when state
courts have failed to consider or have mischaracterized record evi-
dence, as *Sears II* did here, federal habeas courts have concluded
that the state court decision was unreasonable.

For example, in *Brumfield*, a state court found that the record
failed to raise a question about the impairment of the petitioner's
adaptive skills. 576 U.S. at 317. But the Supreme Court concluded
that the state court's determination was unreasonable because "the
evidence in the state-court record provided substantial grounds to
question [the petitioner's] adaptive functioning." *Id.* at 319. The
Court highlighted the "substantial" record evidence that the state
court neglected and observed that the state court's decision relied
on irrelevant evidence. *Id.* at 317–19. The state court's failure to
consider all the evidence in the record amounted to an unreasona-
ble determination of the facts. *Id.* at 319–22.[13]

_____

[13] In *Brumfield*, the Supreme Court also relied on the fact that the petitioner
"had little reason to investigate or present evidence relating to [his] intellectual
disability" at his trial because his trial was held before the Supreme Court's
decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), which recognized that the
execution of an intellectually disabled person violates the Eighth Amendment.
576 U.S. at 321. *Brumfield* explained that the state court "should have taken
into account" the effect of the subsequent change in law on the evidence pre-
sented. *Id.* at 321–22.

We have reached similar conclusions when a state court's decision did not align with the record.  In *Ward v. Hall*, a petitioner argued that his right to a fair trial was violated when a bailiff improperly responded to a juror's question about parole during the penalty phase of his trial.  592 F.3d 1144, 1173 (11th Cir. 2010).  After the state habeas court found that there was no evidence that an improper question was posed, we concluded that the state court's findings were "incorrect and an unreasonable determination of the facts" because there was "clear" record evidence that contradicted the state court's conclusion.  *Id.* at 1177–78 (internal quotation marks omitted).

And in *Jones v. Walker*, we observed that the record belied the Supreme Court of Georgia's description of an attorney's testimony because the record showed that the attorney never gave the particular testimony that the Supreme Court of Georgia described.  540 F.3d 1277, 1288 & n.5 (11th Cir. 2008) (en banc).  We explained that, by mischaracterizing the record, the state court "unreasonably determined the facts" and we therefore "d[id] not owe the state court's findings deference under AEDPA."  *Id.*

Our conclusion today mirrors those decisions.  There is no support for *Sears II*'s finding that Sears "failed to show any chilling effect or other harm" from the *Sabel* rule.  *Sears II*, 493 S.E.2d at 183.  To the contrary, the record abundantly reflects that Sears's counsel argued that *Sabel* inflicted significant prejudice on Sears's defense.  And *Sears II* mischaracterized the record when it faulted Sears's counsel for not arguing against the *Sabel* rule at the ex parte

hearing because that argument had already been raised at the proper time. In sum, the state habeas court's finding that the record failed to support Sears's assertion that the trial court applied the *Sabel* rule was "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

    ii.    *The decision in* Sears II *was based on an unreasonable application of* Wardius.

        Alternatively and additionally, to the extent the state court required Sears to move forward with his motion for a psychiatric evaluation to show a chilling effect or harm, that conclusion is untenable in light of *Wardius*. We have previously considered a case in which a state trial court held under *Sabel* that the defendant had to disclose the identity and reports of all mental-health experts consulted even if they would not testify at trial. *Wellons I*, 554 F.3d at 938. In *Wellons I*, we explained that "*Wardius* and *Rower* make clear that the trial court's *Sabel* ruling in [the defendant's] case violated the Due Process Clause of the Fourteenth Amendment because it granted the prosecution greater discovery rights than [the defendant] possessed in preparing for trial." *Id.* at 939.[14] But *Sears II* does

---

[14] The Supreme Court vacated our judgment in *Wellons I* in full based on its assessment of a different claim presented in that case. *Wellons v. Hall*, 558 U.S. 220 (2010). As a result, *Wellons I* is void and even its discussion of *Sabel* is deprived of legal effect. *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (en banc). And because, on remand, we did not address the petitioner's *Sabel* claim, *see Wellons v. Warden, Ga. Diagnostic & Classification Prison*, 695 F.3d 1202 (11th Cir. 2012), the *Wellons* decisions provide no binding

not include any discussion of *Wardius* nor any consideration of the impact of the *Sabel* rule on Sears's constitutional rights. This deficiency alone requires us to conclude that the state court unreasonably applied clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

In *Wardius*, the defendant sought to introduce alibi witness testimony without complying with Oregon's notice-of-alibi discovery statute. 412 U.S. at 472–73. Similar to the lopsided *Sabel* rule, the Oregon statute required the defense to give the State notice of its alibi witnesses without requiring the State to provide the defense with notice of its rebuttal witnesses. *Id.* at 471–72. After the trial court prohibited the alibi witness from testifying, the defendant brought an inequitable discovery challenge to the Supreme Court of the United States. *Id.*

In the Supreme Court, the State argued that because the defendant failed to give the State notice of his alibi witness, he never provided the state court with an opportunity to demonstrate its willingness to permit reciprocal discovery. *Id.* at 476–77. As the State saw things, the defendant was trying to "litigate the reciprocity issue in the abstract in federal court after bypassing an

---

assessment of *Sabel*. That sequence does not impact our decision here, though, because we conclude—independent of *Wellons I*—that *Sears II* unreasonably applied *Wardius*. And to the extent we discuss *Wellons I*'s assessment of *Sabel*, we find it to be persuasive and adopt it as our own. *See Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009) ("We are free to give statements in a vacated opinion persuasive value if we think they deserve it.").

opportunity to contest the issue concretely before the state judiciary." *Id.* at 477.

The Supreme Court rejected the State's argument. The Court emphasized that "[a]t the time [the defendant] was forced to decide whether or not to reveal his alibi defense to the prosecution, he had to deal with the statute as written with no way of knowing how it might subsequently be interpreted." *Id.* *Wardius* acknowledged the "considerable risk" to defendants posed by the State's suggested course of action. *Id.* If the defendant had revealed his alibi witness to the State, in the hope that the trial court would require the State to disclose its rebuttal witnesses, he could not "retract" his disclosure "should it turn out later that the hoped-for reciprocal discovery rights were not granted." *Id.*

Here, the *Sabel* rule placed Sears in a similar position: even if the trial court had granted Motion 11 and allowed Sears to move forward with the expert evaluation, Sears would have been forced to disclose the information he sought to keep confidential if the trial court later required non-reciprocal discovery (as it did in this case). And if Sears had initially retained but ultimately opted not to call an expert psychiatrist, the State could have "argue[d] to the jury that the defendant would have called the expert had the result of the testing been favorable to the defendant." *Sabel*, 282 S.E.2d at 69.

Under *Sabel*, then, Sears's decision to pursue an expert psychiatrist would have carried the "considerable risk" of a potential adverse inference to the jury. *Wardius*, 412 U.S. at 477. And as in

*Wardius*, Sears "could not have retracted" his decision once he had retained an expert and obtained an evaluation because he would have already provided evidence to the State, whether in the form of tangible discovery of the expert's report or an adverse inference if the expert was not called to testify. *Id.* So *Wardius* requires that we acknowledge that Sears, too, "had to deal with the [*Sabel* decision] as written with no way of knowing how it might subsequently be interpreted." *Id.* Under *Wardius*, Sears "cannot be faulted for taking [*Sabel*] at its word." *Id.* at 478.

The Supreme Court of Georgia's decision to fault trial counsel for "taking [*Sabel*] at its word" plainly contradicted *Wardius*. We are thus not bound to defer to its adjudication of Sears's *Sabel* claim. *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016).

### c.    The *Sabel* error was not harmless.

Our conclusion that the state court's resolution of Sears's *Sabel* claim was unreasonable under § 2254(d) does not end our analysis because we must also determine whether the state court's error was harmless. *Brecht*, 507 U.S. at 637–38.

As we've explained, in habeas cases, a federal constitutional error is harmless unless "actual prejudice" results from it, meaning that the error had a "substantial and injurious effect or influence" on the jury's verdict. *Id.* (internal quotation marks and citations omitted). That standard "is more favorable to and 'less onerous' on the state," than the "beyond a reasonable doubt standard" because it is designed to reflect "the 'states' interest in finality,' the

states' 'sovereignty over criminal matters,' and the limitation of habeas relief to those 'grievously wronged[.]'" *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637) (alteration adopted).

To make this determination, "we must examine the [*Sabel*] ruling in the context of [Sears's] trial to assess the extent of any prejudicial effect." *Wellons I*, 554 F.3d at 939. *See also Al-Amin v. Warden, Ga. Dep't of Corr.*, 932 F.3d 1291, 1301 (11th Cir. 2019) (explaining that when conducting harmless-error analysis under *Brecht*, we "must consider the specific context and circumstances of the trial to determine whether the error contributed to the verdict"). Under *Brecht*, an error is not harmless if, after reviewing the record, we are left with a "grave doubt about the effect of the error." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995); *see also Davis v. Ayala*, 576 U.S. 257, 267–68 (2015).

> i.    *Even without the psychiatric mitigation evidence, the jury nearly imposed a life sentence.*

Our assessment of the harm the *Sabel* rule imposed on Sears's trial is impacted by the facts surrounding the jury's penalty-phase deliberations. The circumstances of those deliberations reveal that Sears nearly received a life sentence.

After deliberating for around six hours during the penalty phase, the jury sent the trial court a note announcing that it was deadlocked eleven to one in favor of the death penalty. *Sears III*, 514 S.E.2d at 430. The jury asked the court how it should complete

the verdict form.  *Id.*  The trial court responded with the following instruction:

> You all have been deliberating on this case for six hours.  I would like you all to consider continuing your deliberations and see what you can do with the case.  I'm not putting any pressure on you to [do] anything one way or another.  Whatever your decision is, that's [your] decision.  But I feel like you need to deliberate on the case longer.

*Id.* (alterations in original).[15]

The jury resumed deliberations for another three hours.  At that point, the jury sent a second note which read,

> [W]e have reviewed the case from start to finish and we are still deadlocked eleven to one in favor of the death penalty.  All twelve jurors agree that there is a hopeless deadlock with no hope of resolution.  Deliberations have ceased.  What do we do now?  All minds are closed.

*Id.* (alteration in original)

---

[15] In *Romine v. State*, the Supreme Court of Georgia held that a trial court can instruct a jury to continue its deliberations to "endeavor to reach unanimity one way or the other on the question of sentence." 350 S.E.2d 446, 450 (Ga. 1986) (internal quotation marks omitted).  A *Romine* charge is a modified version of an *Allen* charge. *See Allen v. United States*, 164 U.S. 492 (1896).

Sears asked the court to accept the jury's "verdict" and impose a life sentence.  The court declined and instead again charged the jury to keep deliberating.  *Id.*  The instruction said,

> I believe it's appropriate to give you some further instructions at this time.  You've been deliberating a while, and I deem it proper to advise you further in regards to the desirability of agreement, if possible.  This case has been exhaustively and carefully tried by both sides.  It has been submitted to you for a decision and verdict, if possible.  While the verdict must be the conclusion of each juror, and not a mere acquiescence of the jurors in order to reach agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard and deference to the opinion of each other.  A proper regard for the judgments of others will greatly aid us in forming our own judgments.  Each juror should listen to the arguments of other jurors.  If the members of the jury differ in their views of the evidence, or the mitigating or aggravating circumstances, such differences of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their opinion.  It's your duty to decide the issues that have been submitted to you, if you can conscientiously do so.  Do not hesitate to change an opinion if you become convinced it's wrong.  However, you

> should never surrender honest convictions or opin-
> ions in order to be congenial or reach a verdict solely
> because of the opinions of other jurors.

*Id.* at 430–31.

The jury was then excused for the evening. *Id.* at 431. The jury resumed deliberations the following morning. *Id.* After an hour and a half, the court was informed that one of the jurors had a Sony Walkman on her head and had been asked to give it to the bailiffs. *Id.* Additionally, the foreman had asked the bailiffs to re-move all reading materials from the jury room. *Id.* The court ad-vised counsel that it had received two notes from the jury room: one from the foreman and one from the juror with the Walkman, Juror Fisher. The note from the foreman (which contained blanks instead of pronouns to "protect the gender of the juror" in ques-tion) read,

> In the jury selection process, each juror was read the
> charges in this case. Murder was not one of the
> charges. The reason that the juror who has stead-
> fastly maintained [ ] position from the outset of delib-
> erations has given for [ ] decision is that [ ] cannot vote
> on the death penalty because the Defendant was not
> convicted of murder. Can you provide the jury with
> a transcript of the questions and answers as to their
> position on the death penalty? We need to know what
> questions were asked and how the jurors responded.
> We would also like for you to provide to the jury a

definition of perjury and the penalty for the commis-
sion of perjury.

*Id.*

The note from Fisher read,

I am concerned about the actions of the foreman of
this jury. This letter is in reference to the foreman's
most recent letter to you. [The foreman] wrote this
letter prior to our jury deliberations today. He in-
formed us that he was submitting the letter to you
whether we wanted him to or not. I don't think this
type of behavior is appropriate for a foreman. I will
not sit on a jury where I am singled out. I am not
being treated fairly in this deliberating process. I am
also being singled out by the foreman, also he is over-
stepping his boundaries as a foreman of a jury. To my
understanding, a foreman should be a leader, not a
dictator. Please explain the duties and responsibilities
of a jury foreman. Should he be able [to] question a
juror's response to the Court during jury selection?

*Id.*

The trial court brought the jury in, summarized the contents
of the notes, and informed the jury that it would not read the voir
dire transcript nor would it define perjury. *Id.* at 431. In doing so,
the court identified the foreman and Fisher by name, as the authors
of the respective notes. *Id.* at 438 (Fletcher, P.J., dissenting). The

court explained that the role of the foreman is to lead deliberations, but "[i]n matters of voting, all jurors stand the same." *Id.* at 431. Finally, the court added,

> A juror is responsible to deliberate in the jury deliber-
> ations.  A juror is supposed to listen to his or her fel-
> low jurors.  A juror is supposed to vote their ideas and
> positions.  A juror is supposed to participate.  It is in-
> appropriate for any juror to do anything other than
> fully participate in jury deliberations.

*Id.* at 431–32.

The jury was sent back for further deliberations and two and a half hours later, the jury announced it had reached a verdict. *Id.* at 432.  The final verdict found each of the statutory aggravating factors and sentenced Sears to death.  *Id.*  Each juror was polled and stated that the verdict was his or her verdict and that it was freely and voluntarily rendered.  *Id.*

When Fisher later testified at an evidentiary hearing held to assess the coerciveness of the verdict,[16] she said that the foreman's perjury threat "frightened" her and led her to change her mind

---

[16] In the context of Sears's juror-coercion claim, the district court used the Federal Rules of Evidence to limit its consideration of the scope of the evidence that was introduced in the state evidentiary hearing and relied upon by the Supreme Court of Georgia in *Sears III*.  But during the evidentiary hearing, the trial court applied Georgia's rules of evidence and admitted Fisher's testimony.  So we consider the testimony here in assessing any prejudice from the *Sabel* error.

because she feared that the "system [could] be manipulated such that they may have, you know, some way had me, you know, on trial for perjury." And she testified that the other jurors were "yelling" and "cursing" at her because they wanted her to change her mind.

> ii.    *The psychiatric mitigation evidence yields a grave doubt about the outcome.*

With this background, we turn to the mitigation evidence that was not presented at trial because the *Sabel* rule prevented Sears's counsel from relying on a psychiatric expert. During his state habeas proceedings—once the *Sabel* rule no longer posed a risk to his defense—Sears was evaluated by two different experts. The parties dispute whether we can consider the evidence Sears developed in state habeas proceedings in our *Brecht* analysis. We conclude that we can and, in fact, we must.

Under AEDPA, our initial review of whether a state-court decision was reasonable is limited to the record at the time of the state court's decision. *Pinholster*, 563 U.S. at 181–82. But at the prejudice analysis that *Brecht* requires, we are not so limited because we've already determined that *Sears II* was based on an unreasonable determination of the facts and an unreasonable application of Supreme Court precedent. So "we are unconstrained by § 2254's deference and must undertake a de novo review of the record." *Daniel*, 822 F.3d at 1260 (citation omitted). In other words, we are "no longer bound by § 2254(d) or limited to consideration of the facts developed in the state court record when evaluating the

merits of [Sears's *Sabel*] claim." *Id.* at 1280; *see also Jones*, 540 F.3d at 1288 n.5 ("Because the Georgia Supreme Court unreasonably determined the facts relevant to [petitioner's constitutional] claim, we do not owe the state court's findings deference under AEDPA. We therefore apply the pre-AEDPA de novo standard of review to [petitioner's] habeas claims.").

In fact, under our precedent, we could not limit our harmless-error analysis to the record before the Supreme Court of Georgia in *Sears II*. In *McWilliams v. Commissioner, Alabama Department of Corrections*, after the Supreme Court of the United States held that a state-court decision was unreasonable, we sought to determine whether the error imposed prejudice. 940 F.3d 1218 (11th Cir. 2019). But there was no "record from which we could assess prejudice, because there ha[d] been no evidentiary hearing" to determine the effect of the state court's error. *Id.* at 1226. Our answer was not to perform the *Brecht* analysis based on the state-court record, but rather, we concluded that "[p]rejudice must be presumed." *Id.*

So the State's suggestion that our *Brecht* review is limited to the record that was before the state court in *Sears II* is not correct. If there were no subsequent record to determine the effect of *Sears II*'s error, *McWilliams* instructs that we presume that the error imposed prejudice. In other words, we presume prejudice only when there is no subsequent record to look to. But when a subsequent evidentiary record exists, we must examine it to assess whether the error inflicted prejudice. Here, an evidentiary record was

developed after *Sears II*, allowing us to evaluate whether *Sears II*'s errors about the impact of the *Sabel* rule prejudiced Sears.

And because of the structure of the *Sabel* rule, the evidentiary record to assess the rule's prejudice could be developed in the posttrial proceedings only. Sears's trial counsel could have presented the court with a proffer of the relevant psychiatric evidence only if they had retained an expert in the first place. And as we've discussed, if they had retained an expert, that expert's report would have been turned over to the State, which could have used the report against Sears, called the expert to testify even if Sears chose not to, or used Sears's decision to retain and not call an expert to obtain an adverse inference. In other words, in the initial trial proceedings, Sears's counsel was caught in the proverbial catch-22— they could not develop a record about the *Sabel* rule's harm without the "considerable risk" of creating unfavorable evidence that could be used against Sears. *Wardius*, 412 U.S. at 477. So this is not a case in which a litigant could have presented the trial court with evidence about the rule's impact but failed to do so. The record relevant to assessing the *Sabel* rule could be developed only after Sears's trial, when *Sabel* no longer posed a risk to Sears's defense.

Notably, when we conduct the prejudice inquiry here, we do not consider the Supreme Court of Georgia's conclusion in *Sears V* that any deficient performance by Sears's trial counsel did not impose prejudice under the standard set forth in *Strickland*. That is so because the *Strickland* prejudice standard "is more stringent (from a petitioner's perspective) than the *Brecht* 'substantial and

injurious effect' standard." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1251 n.49 (11th Cir. 2014).[17]  Indeed, the *Strickland* prejudice standard imposes a "higher burden" on the defendant than does the *Brecht* standard.  *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 86 (2004) (Scalia, J., concurring in the judgment) (describing *Strickland* standard as "less defendant-friendly" than *Brecht* standard). So *Sears V*'s analysis under the *Strickland* standard is distinct from our analysis under the *Brecht* standard.

As we consider the effect of *Sears II*'s *Sabel* error, our only concern is whether that error had a "substantial and injurious effect or influence" on the jury's verdict, *Brecht*, 507 U.S. at 637–38—in other words, whether we have a "grave doubt about the effect of the error," *O'Neal*, 513 U.S. at 436.  If we are "'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, [we] should 'treat the error as if it affected the verdict.'" *Fry v. Pliler*, 551 U.S. 112, 121 n.3 (2007) (quoting *O'Neal*, 513 U.S. at 435) (alterations adopted).[18]

---

[17] *Hittson* arose in the context of the "materiality" standard set forth in *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *Hittson*, 759 F.3d at 1251.  *Hittson* relied on cases decided in the *Strickland* prejudice context (such as *Sears IV*) because that test is "identical" to the *Brady* materiality test.  *Id.* at 1251 n.48.

[18] The district court erred in its consideration of Sears's *Sabel* claim because it did not appreciate the difference between the *Brecht* standard and the *Strickland* standard and therefore deferred to *Sears V*'s prejudice analysis under *Strickland* when the court should have considered the mitigation evidence de novo under *Brecht*.

After reviewing the entire record, we have more than a "grave doubt" that the *Sabel* error had a substantial and injurious effect on the jury's death sentence. At trial, the mitigation evidence centered on the argument that Sears's crimes were completely out of character and that a death sentence would have an adverse impact on his family. *Sears V*, 751 S.E.2d at 377–80.

But the expert-related evidence developed during the habeas proceeding provided different and powerful mitigation arguments. In particular, once Sears's postconviction counsel no longer feared the inequities that the *Sabel* rule imposed, they were able to procure critical expert evidence about Sears's mental-health deficiencies and present that evidence to the state habeas court.

Dr. Tony Strickland, a neuropsychologist, submitted an affidavit and gave both deposition and live testimony. *Id*. at 387. He testified that he performed a neurological assessment of Sears. *Id*. According to Dr. Strickland, Sears "scored in the severely impaired range on three out of four tests that measure higher executive function and abstract problem solving skills." *Id*. at 388. Dr. Strickland opined that the test results were consistent with "frontal/executive deficits likely caused predominantly by the synergistic effects of repeated traumatic brain insults and chronic marijuana and cocaine use." *Id*. He explained that, "with a high degree of predictability," people with deficits like those Sears suffers from "generally make poor decisions, become increasingly disorganized under stress, and have problems with planning, sequencing, and impulse control." *Id*.

Sears also submitted an affidavit and testimony from Dr. Richard Dudley, a psychiatrist. Dr. Dudley conducted a ten-hour interview with Sears and reviewed many of the same documents Dr. Strickland used. *Id.* Dr. Dudley found that Sears's "profound cognitive deficits . . . and gross psychiatric disturbances" are "profoundly debilitating." Affidavit of Richard G. Dudley, Jr., M.D. at 5, Doc. No. 18-28. He also found that Sears "exhibits extreme impulsivity, drastically impaired executive functioning, inappropriate affect, mood disturbance and grandiose thinking . . . ." *Id.* And he concluded that those symptoms could have played a role in the crime. *Id.* at 35–36.

When the Supreme Court of the United States reviewed this evidence in *Sears IV*, the Court highlighted the fact that "[t]wo different psychological experts testified that Sears had substantial deficits in mental cognition and reasoning—*i.e.*, 'problems with planning, sequencing and impulse control,'—as a result of several serious head injuries he suffered as a child, as well as drug and alcohol abuse." *Sears IV*, 561 U.S. at 949 (quoting Strickland Affidavit at 147).

Because of his brain damage, the Court continued, Sears's "scores on at least two standardized assessment tests placed him at or below the first percentile in several categories of cognitive function, 'making him among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli.'" *Id.* (quoting Strickland Affidavit at 148). Specifically, "[o]n the Stroop Word Interference

Test, which measures response inhibition, 99.6% of those individuals in [Sears's] cohort (which accounts for age, education, and background) performed better than he did." *Id*. at 950 (citing Strickland Testimony at 36–37). And "[o]n the Trail-Making B test, which also measures frontal lobe functioning, Sears performed at the first (and lowest) percentile." *Id*. (citing Strickland Testimony at 37–38). So Dr. Strickland concluded that "[t]here is 'clear and compelling evidence' that Sears had 'pronounced frontal lobe pathology'" and that he suffered from "substantial cognitive impairment." *Id*. (quoting Strickland Testimony at 68).

Dr. Strickland's assessment "also revealed that Sears' 'ability to organize his choices, assign them relative weight and select among them in a deliberate way is grossly impaired.'" *Id*. (quoting Strickland Affidavit at 149). And his "'history is replete with multiple head trauma, substance abuse and traumatic experiences of the type expected' to lead to these significant impairments." *Id*. (quoting Strickland Affidavit at 150).

But the jury that sentenced Sears to death was not privy to any of this information. And the *Sabel* rule is largely the reason. Sears's trial counsel could not pursue a psychiatric expert evaluation because of the risk of an unfavorable result that would be disclosed to the State. If Sears's trial counsel had been able to escape the *Sabel* rule and secure an evaluation, Dr. Strickland believed that Sears's "serious cognitive impairment and emotional instability [would] have been captured on tests administered" in the early 1990s, and that those tests "likely would have revealed more

profound deficits than those that existed at the time of [Dr. Strick-land's] testing" in 2004. Strickland Affidavit at 150.

But with *Sabel* looming, Sears's counsel could not risk the possibility of an unfavorable report that would be used against Sears. So counsel was forced to pursue a different mitigation strategy in which the jury was incorrectly led to believe—by both the State and the defense—that Sears lived a charmed and comfortable life with few obstacles. Because of *Sabel*, Sears's trial counsel could not effectively pursue the relevant mitigation evidence that would have allowed the jury to consider Sears's psychiatric disorders as it made its sentencing decision.

Given the severity of Sears's organic limitations, with the added insight into Sears's psychiatric disorders, the jury well could have determined that Sears's culpability was sufficiently mitigated to spare his life. This is especially true here when only one juror's vote was required to impose a sentence other than death. *See Ward*, 592 F.3d at 1180 (finding actual prejudice after "[b]earing in mind that only one vote in favor of life imprisonment was needed to avoid a death sentence").

We think the strength of the psychiatric mitigation evidence alone is sufficient to yield a "grave doubt" that the *Sabel* error affected the outcome. But the jury's hesitation to impose a death sentence even without this evidence furthers our concerns. In *Wiggins*, the Supreme Court made clear that prejudice exists when "there is a reasonable probability that at least one juror would have struck a different balance." 539 U.S. at 537. There, after evaluating

the powerful mitigation evidence uncovered in the posttrial proceedings, the Court found that "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id*. at 536.  It did so, in part, because under the relevant state law, a death sentence could be imposed only when the jury was unanimous. *See id*. at 537.  So any single juror's vote to spare the defendant's life would have been sufficient.

As a result, when we have evaluated prejudice, we have frequently considered the circumstances of the jury's decision to assess whether there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.  After all, the contemporaneous facts surrounding the jury's decision will often bear on the ultimate question of whether a juror may have changed her vote if presented with additional mitigation evidence.  In other words, a jury that (twice) describes itself as "hopelessly deadlocked" is far more likely to strike a different balance in the face of new mitigating evidence than a jury that reached a death sentence without the documented turmoil that Sears's jury experienced.  And the jury's difficulty in reaching a consensus provides the best available insight into whether the outcome would have changed if the jury had been presented with the new mitigation evidence.

Indeed, we have previously found prejudice based on the context of the jury's deliberations in a case in which, "even without" the compelling mitigation evidence that emerged in later

stages, "the jury still came within a single vote of recommending life." *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 564 (11th Cir. 2015) (citing *Wiggins*, 539 U.S. at 537); *see also Daniel*, 822 F.3d at 1276 (finding prejudice partially because "if one more juror voted for a sentence of life without parole, there could have been no recommendation for death"); *Cave v. Singletary*, 971 F.2d 1513, 1519 (11th Cir. 1992) ("[D]espite the presentation of no mitigating circumstances, [petitioner] came within one vote of being spared execution."); *Blanco v. Singletary*, 943 F.2d 1477, 1505 (11th Cir. 1991) (finding that "there was a reasonable probability that [petitioner's] jury might have recommended a life sentence" "[g]iven that some members of [petitioner's] jury were inclined to mercy"); *Lawhorn v. Allen*, 519 F.3d 1272, 1297 (11th Cir. 2008) (finding prejudice after noting that "one juror voted to recommend life instead of death" so defendant "needed only to convince two other jurors to alter the outcome of the proceedings").

Our sister circuits have also confronted cases in which the trial jury "initially reported a deadlock regarding [petitioner's] sentence," and concluded that "[e]ven a slightly more compelling case for mitigation . . . might have altered the outcome of the sentencing phase of [petitioner's] trial." *Mason v. Mitchell*, 543 F.3d 766, 780 (6th Cir. 2008). When considering prejudice, "[t]he jury's initial hesitance in reaching a verdict in the penalty phase . . . weighs towards a finding of prejudice," and "[a] jury note indicating hesitance in reaching a penalty phase verdict suggests that a death sentence for [petitioner] was not a foregone conclusion." *Sanders v. Davis*, 23 F.4th 966, 994–95 (9th Cir. 2022) (internal quotation

marks and citation omitted) (alteration adopted); *see also Stankewitz v. Wong*, 698 F.3d 1163, 1175 (9th Cir. 2012) ("Another indicator of prejudice . . . is the difficult time the jury had reaching a unanimous verdict on death."); *Williams v. Stirling*, 914 F.3d 302, 318 (4th Cir. 2019) ("[P]ersuasive mitigating evidence for a jury—particularly a deadlocked one—considering the death penalty" could be "outcome-determinative[.]").

The record here reveals that even with the limited mitigation evidence that was presented during the penalty phase, due largely to the *Sabel* rule, the jury still struggled to reach a consensus regarding a death sentence. The jury engaged in contentious deliberations, and only after numerous declarations of deadlock and several hostile exchanges did the jury return a "unanimous" verdict sentencing Sears to death. Without *Sabel*, Sears's counsel could have obtained a psychiatric evaluation before the penalty phase and presented the additional mitigation evidence, which could have persuaded at least one juror to impose a sentence other than death. Even without that evidence, a juror came close to doing so.

To be sure, the crimes here were horrific. And the jury, even after learning that Sears was severely disabled and brain damaged, may have still decided that Sears should be put to death. But the trouble is that we can't say we are without "grave doubt" about that. As the Supreme Court of the United States put it in this very case, the mitigation evidence "might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts—especially in light of his

purportedly stable upbringing." *Sears IV*, 561 U.S. at 951. The Court has also reminded us that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). *See also Monge v. California*, 524 U.S. 721, 732 (1998) ("Because the death penalty is unique 'in both its severity and its finality' we have recognized an acute need for reliability in capital sentencing proceedings." (quoting *Gardner v. Florida*, 430 U.S. 349, 357 (1977))).

Our "grave doubt" regarding the "substantial and injurious" impact of the absence of this evidence on the jury's sentencing determination requires us to conclude that the state court's *Sabel* error was not harmless. *Ayala*, 576 U.S. at 268 (quotation omitted). Even if the record left us only at "virtual equipoise" on the question of prejudice, Supreme Court precedent tells us to treat the *Sabel* error as harmful. *See Fry*, 551 U.S. at 121 n.3; *O'Neal*, 513 U.S. at 435. For these reasons, we grant Sears's habeas petition as to this issue and remand for a new sentencing hearing.

### B.    Remaining Claims

We briefly address Sears's remaining claims.[19]

---

[19] Because we hold that Sears is entitled to relief on his *Sabel* claim, we need not and do not consider his claims that his trial counsel provided constitutionally ineffective assistance during the penalty phase of his trial or that his trial counsel was constitutionally ineffective for failing to perfect the *Sabel* issue for direct appeal. *See Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1331 n.1 (11th Cir. 2011). Nor do we reach Sears's claim concerning cumulative error.

*1.    Brady*

Sears argues that the State violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose that his co-defendant Williams was prosecuted and convicted of assault while incarcerated in the Cobb County jail. Sears argues this information would have supported his theory that Williams initiated the kidnapping of Ms. Wilbur. That evidence, according to Sears, could have also been used to impeach Major Bruns's testimony that Sears "was the worst inmate at the Cobb County" jail.

A successful *Brady* claim requires proof that the government withheld "evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain,* 565 U.S. 73, 75 (2012). "Evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 582 U.S. 313, 324 (2017) (quotation omitted) (alteration adopted).

Under AEDPA deference or de novo review, Sears has not shown that, if he was aware of Williams's assault conviction, the result of his trial—at either the guilt or penalty phase—would have been different. *See Thompson v. Wainwright*, 787 F.2d 1447, 1453 (11th Cir. 1986) (finding no prejudice where although new evidence supported theory that co-defendant "initiated the beatings," the defendant "took over" and raped and beat the victim).

### 2.    *Coerced Verdict*

Sears argues that his jury's verdict was unconstitutionally coerced by pressures from the trial judge, the foreman, and some of the fellow jurors.  In Sears's view, the trial judge's *Romine* charges, the foreperson's threat to seek perjury charges against the lone holdout juror (Juror Fisher), and the other jurors' "personal attacks" against Fisher coerced her vote for a death sentence.  In *Sears III*, the state court concluded that Fisher's vote for death was not coerced but simply the product of the "normal dynamic of jury deliberations."  514 S.E.2d at 433 (quoting *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990)).

In *Sears III*, the Supreme Court of Georgia assessed Sears's claim that Fisher was coerced into voting for death.  Because that decision was adjudicated on the merits, it is also entitled to AEDPA deference.  As we've previously noted, we may grant relief on this claim only if the determination in *Sears III* was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

"Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."  *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  "Coercion does not mean 'simple pressure to agree.'"  *Brewster v. Hetzel*, 913 F.3d 1042, 1053 (11th Cir. 2019) (quoting *Smith v. United States*, 542

A.2d 823, 824 (D.C. 1988)). "Pressure becomes coercive when the actions of the court result in 'a minority of the jurors sacrificing their conscientious scruples for the sake of reaching agreement.'" *Id.* (quoting *Green v. United States*, 309 F.2d 852, 854 (5th Cir. 1962)) (alterations adopted).

Assessing whether a verdict was coerced is a mixed question of fact and law, which requires examination of "the totality of the circumstances to see if the court's actions created a substantial risk that one or more jurors would be coerced into abandoning their honest convictions." *Id.* (citing *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008)). *See Gilbert v. Mullin*, 302 F.3d 1166, 1171 (10th Cir. 2002) ("Whether a jury has been improperly coerced by a judge is a mixed question of law and fact.").[20]  A list of relevant, but not exhaustive, circumstances include the following:

> (1) the total length of deliberations; (2) the number of times the jury reported being deadlocked and was

---

[20] The Eighth Circuit has held that a state court's juror-coercion determination raised questions of historical fact that were entitled to deference under the pre-AEDPA version of 28 U.S.C. § 2254(d). *See Stallings v. Delo*, 117 F.3d 378, 381 (8th Cir. 1997). But even *Stallings* acknowledged that whether the underlying facts give rise to a constitutional due-process violation is a legal determination. *Id.* at 380. And when we do not owe AEDPA deference, we review juror-coercion claims de novo, *Brewster*, 913 F.3d at 1053, which further shows that we've treated this inquiry as a mixed question of fact and law and not a purely factual determination. *Cf. United States v. Lewis*, 674 F.3d 1298, 1302–03 (11th Cir. 2012) (explaining ruling on motion to suppress is mixed question of fact and law based on the totality of the circumstances with factual findings reviewed for clear error and application of law reviewed de novo).

instructed to resume deliberations; (3) whether the judge knew of the jury's numerical split when he instructed the jury to continue deliberating; (4) whether any of the instructions implied that the jurors were violating their oaths or acting improperly by failing to reach a verdict; and (5) the time between the final supplemental instruction and the jury's verdict.

*Brewster*, 913 F.3d at 1053 (citations omitted).

Here, the court in *Sears III* concluded Fisher's verdict was not coerced. 514 S.E.2d at 433. *Sears III* noted that Fisher "knew that she had not lied under oath." *Id.* So even though she "felt bullied by the threat of perjury" and "felt intense pressure from the other jurors," the court concluded that "she voted for the death penalty because she felt pressured to do so only as a result of the 'normal dynamics of jury deliberations.'" *Id.* (quoting *Cuthel*, 903 F.2d at 1383).

Three justices dissented. *Id.* at 438–40 (Fletcher, P.J., dissenting). The dissent identified several problems with the penalty-phase deliberations that culminated, in their view, in a coerced verdict.

First, the trial court learned of the numerical division of the deadlock during the second day of deliberations: eleven to one in favor of death. *Id.* at 439. The dissent cited *Brasfield v. United States*, 272 U.S. 448 (1926), for the principle that it is reversible error for a trial court to ask a jury the nature of its split. *Id.* The dissent

acknowledged that in this case, the jury revealed the division without being asked but concluded that the "danger" of coloring the jury's understanding of the judge's instructions was still present in this context. *Id.* (citing *Williams v. United States*, 338 F.2d 530, 532–33 (D.C. Cir. 1964)).  The dissent highlighted that Fisher testified that she believed the judge wanted her to change her vote since he kept sending them back for continued deliberations despite knowing that she was the lone vote for life.  *Id.*

Second, the dissent emphasized that after the trial court ordered the jury to continue deliberating for the third time, the court failed to remind the jury that it was not to "surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinions of the other jurors."  *Id.* (citing *United States v. Berroa*, 46 F.3d 1195, 1197 (D.C. Cir. 1995) (failure to instruct jury that "that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict[]" was reversible error)).

Third, and "most troubling," according to the dissent, was that "the trial court ignored the specter of a perjury prosecution while forcing continued deliberations." *Id.* at 438.  The court identified Fisher by name, notifying the rest of the jurors that she had been the recipient of a perjury threat, yet it "did nothing to dispel the threat of a perjury prosecution against" her. *Id.* at 439.  Instead, it gave "open-ended" instructions regarding the duties of a foreman.

The dissent acknowledged that the "final two notes revealed a serious personal conflict within the jury room, which the evidence on remand confirmed." *Id.* Given the length of the deliberations, the nature of the division, the judge's awareness of the division, the threatened perjury prosecution against the lone holdout, the court's inadequate final instructions, and the three-hour verdict turnaround (despite the lack of progress in the previous ten-and-a-half hours of deliberation), the dissent concluded that Sears's death verdict was coerced. *Id.* at 440.

Were we reviewing the propriety of the verdict de novo, we would agree with the dissenting justices. The many issues with the deliberations are apparent. Rather than accept the jury's verdict after the announced deadlocks, the trial court called out Fisher as the recipient of the perjury threat, failed to assure her of its impropriety, and then exercised its discretion to compel continued deliberations (for a third time). In doing so, the court failed to remind the jurors that they were not to sacrifice their honest beliefs for the sake of building consensus or appeasing their peers. And worse still, the court's failures came after it knew the nature of the jury's division and that Fisher was the sole holdout juror.

The trial court ignored Fisher's pleas for help against the foreman's threat that if she didn't agree to a death sentence, she'd be prosecuted for perjury. And rather than admonishing the jury to be civil and focus on the facts and law as given (and not juror-initiated prosecutions), the trial court again gave facially neutral instructions that could have been meant for only Fisher. When the

court sent Fisher back to the hostile deliberation room one last time, it failed to caution the jurors against surrendering their honestly held beliefs. *Sears III*, 514 S.E.2d at 439 (Fletcher, P.J., dissenting) ("The failure to include these cautionary statements weighs in favor of a finding of coercion."). At that point, Fisher had little choice but to surrender. So the pressure imposed on Fisher to change her vote was improperly coercive, and the sentencing verdict here could not stand under the criteria we explained in *Brewster* if that were the controlling standard.

But under AEDPA, we must defer to *Sears III* so long as *Sears III* did not unreasonably determine the facts in light of the evidence presented or was not decided contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. And here, Sears cannot meet the AEDPA standard on either ground.

With respect to its factual determinations, *Sears III* recounted the circumstances leading to the verdict. 514 S.E.2d at 430–32. It then analyzed Fisher's testimony and determined that "it is clear that she voted for the death penalty because she felt pressured to do so only as a result of the 'normal dynamic of jury deliberations.'" *Id.* at 433 (quoting *Cuthel*, 903 F.2d at 1383).

While we do not endorse *Sears III*'s conclusion that the pressure imposed on Fisher was in any way "normal," we also cannot agree that there is clear and convincing evidence that *Sears III* erred in its factual determinations. Sears's arguments depend on speculation about what would have happened if Fisher disavowed her

vote during the polling process or what she would have testified about her reasons for changing her vote if she had testified in full. But even if we agree with Sears's suggested inferences, the record lacks clear and convincing evidence to establish their accuracy. So we must defer to *Sears III*'s determinations.[21]

Nor can we conclude that *Sears III* unreasonably applied the Supreme Court's case law. The Court's case law on the constitutional rule against coerced verdicts is sparse. When *Sears III* was decided, the primary case on this topic was *Lowenfield*. And in *Lowenfield*, the Court held that the jury's penalty-phase verdict was not coerced after the trial court polled the jurors regarding whether further deliberations would be helpful and then instructed the jury to continue deliberating. 484 U.S. at 240–41.

To be sure, *Lowenfield* indicated that juror coercion can give rise to a constitutional claim and that this inquiry is based on the totality of the circumstances. 484 U.S. at 237–38; *see also Wong v.*

---

[21] The result here differs from the result on Sears's *Sabel* claim because, as we explained in our discussion of Sears's *Sabel* claim, *Sears II* omitted and mischaracterized key record evidence to reach its conclusion that the *Sabel* rule did not impose a chilling effect on Sears's trial counsel. These failures led to our conclusion that *Sears II* unreasonably determined the facts underlying the *Sabel* claim, given the evidence presented, and required us to conduct a de novo review. By contrast, *Sears III* included the record evidence that was relevant to the coerced-verdict claim. Our disagreement with *Sears III*'s conclusion is insufficient to conclude that its determination was unreasonable. *Brumfield*, 576 U.S. at 313–14 ("We may not characterize these state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." (citation omitted) (alteration adopted)).

*Smith*, 562 U.S. 1021, 1023 (2010) (Alito, J., dissenting from denial of certiorari) ("About all that can be said is that coercive instructions are unconstitutional, coerciveness must be judged on the totality of the circumstances, and the facts of *Lowenfield* . . . were not unconstitutionally coercive."). But the Supreme Court has not elaborated on times when juror coercion violates a defendant's constitutional rights. So we cannot conclude that *Sears III* unreasonably applied existing federal law.

Sears points to two other cases in which the Court reversed convictions based on jury instructions given in federal prosecutions. *See Jenkins v. United States*, 380 U.S. 445 (1965) (per curiam); *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978). But the Supreme Court has since explained that *Jenkins* and *Gypsum Co.* were both based on the Court's "supervisory power over the federal courts, and not on constitutional grounds." *Lowenfield*, 484 U.S. at 239 n.2; *Early v. Packer*, 537 U.S. 3, 10 (2002) (per curiam). So both *Jenkins* and *Gypsum Co.* "are off the table as far as § 2554(d) is concerned." *Packer*, 537 U.S. at 10.

Without further explanation from the Supreme Court about the constitutional claim against coercive instructions, even though we would have reached a different conclusion, we cannot hold that *Sears III* unreasonably applied clearly established federal law. We therefore deny Sears's petition on this ground.

### 3.    Biased Juror

Sears argues that he was deprived of a fair and impartial jury because one of the jurors (Juror Makant) failed to disclose his

daughter's rape during jury selection and then raised the incident during jury deliberations once his fellow juror announced she made up her mind to vote for a life sentence. From Sears's perspective, as a defendant prosecuted for rape,[22] it is fundamentally unfair for a juror to withhold this information during jury selection, only to openly discuss it during jury deliberations after a fellow juror has revealed her decision to vote against a death sentence. Sears's trial attorney later testified that, if Makant had disclosed the fact of his daughter's rape during jury selection, it would have been "an absolute disqualifier[.]" Trial counsel testified that he would have moved to strike Makant for cause, and if need be, he would have exercised a peremptory strike to get him off the jury.

Because the Supreme Court of Georgia adjudicated this claim on the merits, *see Sears III*, 514 S.E.2d at 433–34, we must apply AEDPA deference to its decision. And we treat the state court's determination that the juror was not biased as a finding of historical fact. *Patton v. Yount*, 467 U.S. 1025, 1036–37 (1984). Through AEDPA's lens, we cannot find the court "managed to blunder so badly that every fair-minded jurist would disagree[]" with its ultimate conclusion. *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam).

---

[22] While the State did not charge Sears with rape, it used the allegation of rape as an aggravating factor to statutorily justify imposition of the death penalty. *See* O.C.G.A. § 17-10-30.

To receive a new trial based on a juror's incorrect answer during jury selection, a defendant must demonstrate (1) that the juror was dishonest and (2) that if the juror provided the correct information, it "would have provided a valid basis" to strike the juror "for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

Here, the state court found that Makant's answer to the question of whether any member of his family had "ever been the victim of a violent crime" was not dishonest. *Sears III*, 514 S.E.2d at 433. Makant testified at a posttrial hearing that he believed the question referred to circumstances in which "there [had] been [a] conviction or, you know, court proceeding on it." *Id.* Because the individual who raped Makant's daughter had not been arrested or prosecuted, he believed his negative answer to the question was true. *Id.* The court found that Makant "answered the question truthfully, as he understood it." *Id.* In the alternative, the court found that Makant's answer, even if it were found to be dishonest, "would not have provided a valid basis for a challenge for cause." *Id.* at 434 (citations omitted).

The truthfulness of Makant's response is questionable given that the same questionnaire, in the very next few lines, asked if the crime led to anyone's arrest or conviction. *Id.* at 433. Our concern about truthfulness is amplified by Makant's subsequent discussion of the crime during the jury deliberations. *Id.* at 434. But we cannot say that the *Sears III* court's conclusion that a correct response would not have provided a valid basis for cause was erroneous

"beyond any possibility for fairminded disagreement." *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam) (quoting *Richter*, 562 U.S. at 103). Although Sears's attorneys may have surely moved to strike Makant for cause, we cannot say that the state court's conclusion that Makant would not have been stricken for cause was unreasonable. *See, e.g.*, *Fields v. Brown*, 503 F.3d 755, 774 & n.12 (9th Cir. 2007) ("Being the spouse of a rape victim is not, in and of itself, such an 'extreme' or 'extraordinary' situation that it should automatically disqualify one from serving on a jury in a case that involves rape."); *Gonzales v. Thomas*, 99 F.3d 978, 989 (10th Cir. 1996) ("[A] rape victim as a matter of law [is not] incapable of being impartial in the trial of an accused rapist.").

### 4. Eleventh Hour Statutory Aggravating Factor

Sears argues that the State's reliance on the "outrageous or wantonly" vile aggravating factor, O.C.G.A. § 17-10-30(b)(7), without providing him of notice of its intent to do so violated his constitutional right to due process. This argument is foreclosed by our decision in *Grim v. Secretary, Florida Department of Corrections*, 705 F.3d 1284, 1288–89 (11th Cir. 2013).

### 5. Failure to Recuse

Sears argues that his initial trial-court judge (who presided over pretrial motions, not the trial) was not impartial, as he had a social and professional relationship with the victim and her husband. Thus, Sears submits his right to a fair trial was violated. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 250 (1980) (A judge's "impartiality serves as the ultimate guarantee of a fair and meaningful

proceeding in our constitutional regime."); *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.").

But in state court, Sears raised his recusal challenge in *Sears I* under only state law. So his claim is unexhausted, and he is not entitled to relief. *See* 28 U.S.C. § 2254(b)(1)(A).

Ordinarily, a "mixed petition" with both exhausted and unexhausted claims should be dismissed, "leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims." *Rose v. Lundy*, 455 U.S. 509, 510 (1982). But we have explained that "[d]ismissing a mixed petition is of little utility . . . when the claims raised for the first time at the federal level can no longer be litigated on the merits in state court because they are procedurally barred." *Kelley v. Sec. for Dep't of Corr.*, 377 F.3d 1317, 1351 (11th Cir. 2004). So we "forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief." *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998).

Here, it is clear to us that Sears could no longer pursue his recusal claim in state court. He presented this claim in his interim appeal to the Supreme Court of Georgia, where it was decided on the merits in *Sears I*. 426 S.E.2d at 554–55. And he does not include any new facts here that were not before the court in *Sears I*. In such circumstances, Georgia courts do not reconsider claims that were already decided simply because a petitioner raises new or different

arguments. *See Humphrey*, 717 S.E.2d at 178 ("We reject [petitioner's] argument that his . . . claim should be re-opened, because we find that he has pointed merely to a new *means* by which the relevant facts might be proven rather than to any new underlying facts." (emphasis in original)). So the recusal claim that Sears brings here would also fail in state court.

## IV.    CONCLUSION

Our review of the record compels the conclusion that Sears is entitled to relief on Claim II of his First Amended Petition for Writ of Habeas Corpus. We therefore affirm in part and reverse in part the district court's determination and remand with instructions that the district court issue a writ of habeas corpus vacating Sears's death sentence and conduct any further proceedings consistent with this opinion.

**AFFIRMED    IN    PART    and    REVERSED    AND REMANDED IN PART.**